STATE of Missouri at the relation of
Jack C. JONES, Relator,

v.

Newton ATTERBURY, State Comptroller
of the State of Missouri, Respondent.

STATE of Missouri at the relation of
William M. TURPIN, Relator,

v.

Newton ATTERBURY, State Comptroller
of the State of Missouri, Respondent.

Nos. 45622, 45780.

Supreme Court of Missouri,

En Banc.

April 8, 1957.

Jack C. Jones, Carrollton, relator pro se.

William M. Turpin, Bowling Green, relator pro se.

John M. Dalton, Atty. Gen., Donald D. Guffey and Fred L. Howard, Asst. Attys. Gen., for respondent.

STORCKMAN, Judge.

These original proceedings in mandamus seek to require the state comptroller to pre-approve or certify the expense accounts of the relators incurred by them in their attendance at the meetings of investigatory committees of the General Assembly held when the General Assembly was not in regular or special session. One was a Committee on Water Resources created by the Senate alone, and the other a Committee on Juvenile Delinquency created by concurrent action of both houses of the General Assembly. The two actions have been consolidated for purposes of argument and decision.

Cause No. 45,622 involves the Senate Committee on Water Resources. Senate Resolution No. 100 creating this committee is as follows:

"Whereas, water is one of our basic and most valuable resources, and is essential for domestic, agricultural purposes; and

"Whereas, many users of water are suffering from lack of sufficient supply of water; and

"Whereas there is no clear policy on water use and rights in water in this state with the result that available resources are not being used to their fullest advantage; and

"Whereas the General Assembly is in need of factual information on water resources and water use rights in order that it may perform its duty to provide for the general welfare; now, therefore,

"Be It Resolved that the president pro tem appoint a committee of five senators to study water resources and rights in water in this state and to recommend a water use policy for the state of Missouri. The committee shall reports its findings and recommendations to the Sixty-ninth General Assembly; and

"Be It Further Resolved, that the state geologist, the division of resources and development and all other agencies of the state government shall cooperate with the committee and shall furnish such information and assistance as the committee may require; and

"Be It Further Resolved that the Committee on Legislative Research be requested to provide such professional, clerical and other staff services as the committee may require in the performance of its duties; and

"Be It Further Resolved that the actual and necessary expenses of the

committee and of the members of the committee shall be paid out of the contingent fund of the Senate."

This resolution was offered in the Senate of the Sixty-eighth General Assembly of Missouri on May 5, 1955, and was adopted on May 12, 1955. Relator Jones is one of five members of the Senate appointed May 31, 1955 to membership on the committee. A meeting of the committee was held in Jefferson City on January 11, 1956 at which time the General Assembly was not in session. On January 31, 1956, relator forwarded to the respondent comptroller the account of his actual and necessary expenses in the amount of $18.25 incurred in attending the committee meeting.

Cause No. 45,780 involves the Joint Committee on Juvenile Delinquency which purported to be created by Senate Concurrent Resolution No. 10. This resolution is as follows:

"Whereas, juvenile delinquency and crimes by youthful offenders are increasing at such an alarming rate as to be a problem of gravest import to our society; and

"Whereas, the laws of Missouri relating to children and youths are not in conformity with modern practice procedure and understanding; and

"Whereas, the University of Missouri recently conducted a Conference on the Control of Juvenile Delinquency which was attended by many persons interested in this pressing problem and which Conference adopted a resolution urging the creation of a committee to investigate the problems of juvenile and youthful offenders under the age of twenty-one years; now, therefore,

"Be It Resolved by the Senate, the House of Representatives concurring therein, that a special joint committee of ten members be appointed to investigate the problems of juvenile and youthful offenders under twenty-one

years of age and the laws, practices, procedures and services relating thereto. The committee shall consist of five members of the Senate, appointed by the president pro tem of the Senate, and five members of the House, appointed by the speaker of the House. The committee shall prescribe its own organization and rules of procedure; and

"Be It Further Resolved, that the committee may create advisory committees of interested citizens; and

"Be It Further Resolved, that the Committee on Legislative Research be requested to provide such professional, clerical and other services as the committee may require in the performance of their duties; and

"Be It Further Resolved, that the committees shall prepare and submit a report to the Sixty-ninth General Assembly together with such recommendations as it deems appropriate; and

"Be It Further Resolved, that the members of the committee shall be reimbursed for their actual and necessary expenses incurred in the performance of their duties as members of the committee. The actual and necessary expenses of the committee and its members shall be paid from the contingent funds of the Senate and House of Representatives in equal proportions."

This resolution was duly adopted in the Missouri Senate on May 2, 1955, and in the House of Representatives on May 6, 1955. Pursuant to the provisions of the resolution, the speaker of the House appointed the relator Turpin as one of five House members. The president pro tem of the Senate likewise appointed five members to membership on the committee. The Joint Committee on Juvenile Delinquency met in Jefferson City on June 19, 1956, at which time the General Assembly was not in session. Relator Turpin incurred expense in

the amount of $14.88 in attending the meeting of the committee.

The respondent state comptroller refused to approve the expense accounts of the relators Jones and Turpin on the ground that the committees were without lawful authority to function and incur expenses while the General Assembly was not in session. The cases are before the court on the petitions of the relators, the returns of the respondent, the briefs and oral arguments of the parties.

In brief, the respondent contends that neither the Senate alone, nor the General Assembly, acting by a joint or concurrent resolution, has the power to create a committee with authority to sit after sine die adjournment of the General Assembly; that the attempt by concurrent resolution to confer authority on a joint committee to sit after sine die adjournment is further in violation of the Missouri constitution because the resolution was not presented to the governor for his consideration or proceeded upon as in the case of a bill; and, finally, that relators cannot prevail in any event because the resolutions do not specifically or by clear and unmistakable implication authorize the committees in question to function after adjournment of the General Assembly sine die.

Article III, § 1, of the 1945 Constitution, V.A.M.S., vests the legislative power of the State of Missouri "in a senate and house of representatives to be styled 'The General Assembly of the State of Missouri.'" The legislative power has been so vested since Missouri became a state. Art. III, § 1, Constitution of 1820, V.A.M.S., Art. IV, § 1, Constitutions of 1865 and 1875, V.A. M.S.

■ The constitution of the State of Missouri is not a grant but a restriction or limitation on the legislative powers; therefore the General Assembly has all legislative powers not denied it by the constitution. Bohrer v. Toberman, 360 Mo. 244, 227 S.W.2d 719, 722 [2]; Clark v. Austin, 340 Mo. 467, 101 S.W.2d 977, 988 [5].

■ The constitution, in general, is subject to the same rules of construction as other laws, due regard being given to its broader scope and objects, as a charter of popular government, and the intent of the organic law is the primary object to be attained in construing it. State ex rel. Harry L. Hussman Refrigerator & Supply Co. v. City of St. Louis, 319 Mo. 497, 5 S.W.2d 1080, 1084 [4]. The constitution must be read as a whole and seemingly conflicting provisions should be harmonized so as to give effect to the whole. State ex rel. Moore v. Toberman, 363 Mo. 245, 250 S.W. 2d 701, 705 [3]; State on Inf. of McKittrick v. Williams, 346 Mo. 1003, 144 S.W.2d 98, 103 [10].

■ The other branches of the state government are prohibited from exercising any powers belonging to the General Assembly "except in the instances in this Constitution expressly directed or permitted." Art. II, § 1, Constitution of 1945. It follows that the courts cannot interfere with the action of the legislative branch unless the action taken is clearly contrary to some constitutional mandate. Bohrer v. Toberman, 360 Mo. 244, 227 S.W.2d 719, 723–724 [6]. It is in this atmosphere that we must consider the questions presented. They are before the court for the first time and their determination is not without difficulty.

■ The respondent concedes that incidental and auxiliary to its power to enact legislation, the General Assembly, or either of its houses, has the inherent and implied power to create investigatorial committees with authority to sit *while the General Assembly is in session* for the purpose of developing information relative to prospective legislation. We adopt this view, which is in accord with the overwhelming weight of state and federal authority. See In re Southard, Cal., 83 P.2d 932, 935 [1, 2], and 28 A.L.R. 1154 (annotation). Respondent contends, however, that the authority of committees of the General Assembly to function beyond final adjournment of the legislative body may not be extended except by a bill duly enacted into law.

Respondent's essential contention is that the power of the General Assembly, or either house thereof, to investigate for legislative purposes ceases when the power to legislate ceases, and that an investigatory committee "is a mere agency of the body creating it, and unless continued by law it dies when the body itself dies." He depends largely upon § 20a, art. III, of the constitution as amended November 4, 1952, which provides that the General Assembly shall stand adjourned sine die at midnight on the 31st day of May following its convening in regular session, and that special sessions shall end at midnight on the sixtieth calendar day after its convening. The constitution as adopted in 1945 did not place such time limitations upon either the regular or special sessions of the General Assembly. Art. III, § 20, § 39(7), and art. IV, § 9.

■ The term "sine die" means "without day," and a legislative body adjourns sine die when it adjourns "without appointing a day on which to appear or assemble again; finally, as Congress adjourned *sine die.*" Webster's New International Dictionary, 2d Ed., Unabridged; Black's Law Dictionary, 4th Ed. The Missouri General Assembly is distinguishable, however, from a body such as a constitutional convention which is selected for a specific purpose. When the latter completes its work and adjourns sine die it is functus officio in that it "has fulfilled the purpose of its creation, and is therefore of no further virtue or effect. The term is applied to something which once has had life and power, but which has become of no virtue whatsoever, * * *." 37 C.J.S., Functional—Fund, p. 1401. A report of commissioners in a condemnation proceeding becomes functus officio when a jury trial has been ordered. Siemers v. St. Louis Electric Terminal Ry. Co., 348 Mo. 682, 155 S.W.2d 130, 135 [7].

■ However, the constitution does not vest the legislative power in the General Assembly for a limited time or purpose. Art. III, § 1. The members of the General Assembly are public officers and as such they hold their offices for the term thereof and until their successors are duly elected and qualified. Art. VII, § 12, and art. III, § 14. They remain members of the General Assembly when not in legislative session. This is further evidenced by the fact that they are paid monthly and not by the session or for the time they are in session. Art. III, § 16. It is more proper to say that the General Assembly always exists as the depositary of the legislative power of state government, but that its right to function in a legislative way is limited to the time when it is in regular or special session. It is bound to reconvene, if not in special, then at the next regular session, the time of which is fixed by the constitution. Art. III, § 20, art. IV, § 9.

■ The legislative powers of the State of Missouri are vested in the Senate and House of Representatives jointly and whatever continuity they may have as the depositary of the legislative powers is jointly shared and cannot be independently exercised. In the case of In re Southard, Cal. 1938, 83 P.2d 932, 935, the court stated: "The overwhelming weight of authority is to the effect that neither house of a legislature may lawfully appoint a committee by single house resolution with power to sit after adjournment sine die, in fact, every state court that has considered this problem has so held." Many authorities were cited. This result appears sound. Since the Southard decision the Supreme Court of Washington, in State ex rel. Robinson v. Fluent, Wash., 191 P.2d 241, 252 [9], in a well-reasoned opinion, has also ruled that because of the limited power of one house as contrasted with the total authority of the general assembly, one of the houses, acting alone, cannot create a committee with power to sit after adjournment of the legislature. So far as we have been able to determine, there is no state authority to the contrary.

Relator Jones urges, however, that the Missouri Senate, like the Senate of the United States, is a continuing body and for

that reason the Senate committee has the legal vitality to sit after adjournment. He relies upon the cases of McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, and Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692. These cases hold that the Senate of the United States is a continuing body in that one-third of the terms of its members expire every two years, so that there is always a nucleus of two-thirds of the membership; that as a continuing body the Senate of the United States has the power and authority to make ancillary investigations for the purpose of developing facts and information to guide it in its legislative functions, and such committee may be authorized to sit during the interval when Congress is not in session if it is specifically authorized so to do.

The respondent points out that all members of the Missouri House of Representatives are elected at each general election, art. III, § 2, and that one-half of the members of the Missouri Senate are elected every two years, art. III, § 11. He correctly concludes that all members of the House of Representatives and one-half of the members of the Senate are newly elected for each regular session of the General Assembly. We do not think that the Missouri Senate is a continuing body in the same sense as the Senate of the United States, since the number of hold-over senators is not a quorum and is less than a constitutional majority. Art. III, §§ 20, 27. We hold that the Senate of the Missouri General Assembly does not have authority, acting independently, to create committees to sit after adjournment of the General Assembly.

The case for an interim investigating committee established by a resolution concurred in by both houses of the General Assembly stands on a somewhat different footing. However, the decisions of the various state courts where the question has been raised are in conflict. This is not wholly unexpected, since each state decision depends upon the legislative limitations and the public policy as expressed in the constitution and statutes of each particular state. There is no express prohibition in the Missouri constitution and we do not think that any should be implied from automatic sine die adjournment provided by § 20a of art. III. Whether voluntary or involuntary, the effect of a sine die adjournment of a regular session would be the same. In fact, the shorter session might create a greater need for interim committees. The cessation of legislative activity does not expressly or by implication require the discontinuance of investigatory committee work. The dormant body with its prospect of reactivation is sufficient to sustain the vitality of the incidental and auxiliary investigative function. We are supported in this view by what we believe is the better reasoning as expressed in the cases of State ex rel. Robinson v. Fluent, Wash., 191 P.2d 241; In re Opinion of the Justices, 248 Ala. 590, 29 So.2d 10; In re Davis, 58 Kan. 368, 49 P. 160; People v. Backer, 113 Misc. 400, 185 N.Y.S. 459, 460.

Any doubt as to the policy of this state seems to be removed by the inclusion in the 1945 constitution of art. III, § 35, providing for a permanent joint committee on legislative research. This entirely new section is confirmatory of the statutory provisions for a legislative research committee existing at the time the constitution was drafted and adopted. See Laws of Missouri 1943, p. 632, approved May 22, 1943, now Ch. 23, RSMo 1949, V.A.M.S. Section 14743A of the act, Laws of Missouri 1943, p. 636, provided as one of the duties of the permanent research committee that it should "(3) Upon written request, assist and cooperate with any *interim legislative Committee* or Commission created by the General Assembly." (Emphasis supplied.) We deem this fact to have a double significance. First, it is a recognition by the people in adopting the constitution that interim committees of the General Assembly could be validly created. These statutory provisions were within the actual knowledge of the framers of the constitu-

tion. Debates of the 1945 Constitutional Convention, pp. 3980–4000. Secondly, the statutory provision quoted is a recognition that the permanent Joint Committee on Legislative Research did not pre-empt the field of interim research and investigation so as to preclude the creation of interim committees. The effect of the constitutional provision was at least an implied endorsement of the interim committee idea, since the practice was known and not prohibited.[1]

Next for our consideration is respondent's contention that Senate Concurrent Resolution No. 10 is in violation of art. III, § 31, and art. IV, § 8, of the 1945 Constitution of Missouri in that it was not presented to the governor for his consideration and approval or veto. Art. III, § 31, the Legislative Department, reads as follows: "All bills and joint resolutions passed by both houses shall be presented to and considered by the governor, and within fifteen days after presentation he shall return them to the house of their origin endorsed with his approval or accompanied by his objections. If the bill be approved by the governor it shall become a law. When the general assembly adjourns, or recesses for a period of thirty days or more, the governor may return within forty-five days any bill or resolution to the office of the secretary of state with his approval or reasons for disapproval." Sections 32 and 33 following provide the procedure in case of a veto or the failure of the governor to return a bill.

Section 8 of art. IV, a part of the article on the Executive Department, is as follows: "Every resolution to which the concurrence of the senate and house of representatives may be necessary, except on questions of adjournment, going into joint session, and

of amending this Constitution, shall be presented to the governor, and before the same shall take effect, shall be proceeded upon in the same manner as in the case of a bill; Provided, that no resolution shall have the effect to repeal, extend, or amend any law." The executive department article contains no other section relating to this subject matter or the procedure to be followed in the event of the governor's approval or disapproval.

The substance of § 31, art. III, and § 8, art. IV, has been in our constitution since Missouri was admitted to statehood. In its original form, as embodied in the Constitution of 1820, art. IV, relating to the executive power, it reads:

"§ 10. Every bill which shall have been passed by both houses of the general assembly, shall, before it becomes a law, be presented to the governor for his approbation. If he approve, he shall sign it; if not, he shall return it with his objections, to the house in which it shall have originated; and the house shall cause the objections to be entered at large on its journals, and shall proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the same, it shall be sent, together with the objections, to the other house, by which it shall be in like manner reconsidered, and if approved by a majority of all the members elected to that house, it shall become a law. In all such cases, the votes of both houses shall be taken by yeas and nays, and the names of the members voting for and against the bill shall be entered on the journals of each house respectively. If any bill

<hr>

1. Reverting to questions previously discussed, art. III, § 35, is further persuasive of a public policy that interim research and investigatory work is not only authorized but should be done by joint committees rather than individual house committees. The section also provides: "The general assembly, by a majority vote of the elected members, may

discharge any or all of the members of the committee *at any time* and select their successors." (Emphasis supplied.) We need not decide whether this provision permits the General Assembly to exercise this function during adjournment and, if so, in what manner it could be done.

814

shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall become a law in like manner as if the governor had signed it, unless the general assembly by its adjournment shall prevent its return, in which case it shall not become a law.

"§ 11. Every resolution to which the concurrence of the senate and house of representatives may be necessary, except on cases of adjournment, shall be presented to the governor, and before the same shall take effect, shall be proceeded upon in the same manner as in the case of a bill."

The interrelation of the provisions for the submission of legislative acts to the governor is apparent in this original arrangement. Later constitutional conventions revised the material, separated it into additional paragraphs, and moved all of them except the paragraph relating to concurrent resolutions, to the legislative article. The original sections became §§ 9 and 10 of art. V of the Constitution of 1865. A clause was added to § 9 dealing with the governor's signature after adjournment and the additional exceptions with respect to going into joint session and amending the constitution were inserted in § 10.

The substantial redrafting and rearranging of the material occurred in the constitutional convention of 1875. A portion of the material was moved to the legislative

article and became §§ 38, 39 and 40 of art. IV of the Constitution of 1875. Two paragraphs were retained in the executive article, being §§ 12 and 14 of art. V. The words "and joint resolutions" were added in § 12 and the proviso against repealing, extending, altering or amending a law by resolution was added to § 14. We have found no reason for adding the reference to joint resolutions unless it is by reason of the separation of that section from the one dealing with resolutions "to which the concurrence of the Senate and the House of Representatives may be necessary."

In the 1945 constitutional convention § 12, art. V (1875) was also moved into the legislative article and, in combination with material from § 38, art. IV (1875), became § 31, art. III (1945), which is here in controversy. Sections 39 and 40, art. IV (1875) became §§ 32 and 33, art. III of the 1945 constitution without substantial change. Section 14, art. V (1875) alone was retained in the executive article and became § 8, art. IV, of the present constitution and as such is involved in our inquiry.

It is interesting and informative to observe, on the other hand, the course taken by those constitutions which probably served as a pattern for these sections of Missouri's first constitution. The original constitution of Missouri was influenced principally by the then existing constitutions of Alabama, Kentucky, Maine and Illinois.[2] The constitution of Illinois had no reference to resolutions and required considera-

2. Floyd Calvin Shoemaker, in his *Missouri's Struggle for Statehood* at pp. 249–250 states: "In the framing of some parts it is apparent that one or two state constitutions were largely the patterns followed; as regards other parts it appears that they were selected from first one and then another state's organic law. Naturally the very character of the inhabitants of Missouri predisposed them to follow the southern type of constitutions, especially those of Kentucky and Alabama in preference to those of the north, but this did not seemingly in the least hinder the convention from favor-

ing and choosing a section from the constitutions of Maine, Delaware, Connecticut or Pennsylvania, or from Ohio and Indiana, and throughout the entire document is seen the great influence exerted by the constitution of Illinois. In fact it appears that with the exception of Kentucky, the latest framed state constitutions, e. g., Alabama, Illinois, Maine, etc., were more influential than the others." Also see treatise on Constitutions and Constitutional Conventions in Missouri by Isidor Loeb, Vol. 1, Journal Missouri Constitutional Convention 1875, p. 11.

tion of bills by a committee of the supreme court and the governor, but the Constitution of Alabama, 1819, art. IV, §§ 16 and 17, and the Constitution of Kentucky, 1799, art. III, §§ 25 and 26, were practically identical with each other and with the comparable sections in the first Missouri constitution, except that the Alabama and Kentucky constitutions required "every order, resolution, or vote to which the concurrence of both houses may be necessary, except on a question of adjournment" to be presented to the governor. The present constitution of Alabama has consolidated its two original sections into one, but has made no change in substance. See art. V, § 125, Constitution of Alabama, 1901. The present constitution of Kentucky retains these provisions in two adjoining paragraphs with unimportant changes in verbiage. Secs. 88 and 89, 1 KRS 1956, p. 13.

The Constitution of Maine, 1819, contained in one paragraph that which was in two sections in the other constitutions. Art. IV, pt. 3, § 2, omitting the portion pertaining to the procedure after veto, reads as follows: "Every bill or resolution having the force of law, to which the concurrence of both Houses may be necessary, except on a question of adjournment, which shall have passed both Houses, shall be presented to the Governor, and if he approve, he shall sign it; if not, he shall return it with his objections to the House, * * *." This section has been retained without change in the present constitution of Maine. Art. IV, Part Third, Legislative Power, § 2, 1 Revised Statutes of Maine 1954, p. LXXXIV.

Very likely the basic pattern for all of these state constitutions is in art. I, § 7, of the Constitution of the United States. Clauses 2 and 3 thereof, omitting the pro-

cedure for passage over the presidential veto, are as follows: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections * * *. Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." Needless to say, this section is unchanged since its adoption.

From the foregoing it is evident that, in all the constitutions noted, the provisions for submitting bills and resolutions to the executive officer were related in form and in substance. By separation and rearrangement of these provisions of the 1820 Constitution of Missouri, the original context has been altered and the meaning obscured; however, the original intent remains, absent some evidence of a purpose to change it. So far as material to our present inquiry, no such purpose is indicated by the changes in phraseology and arrangement made by the last two constitutional conventions, as disclosed by their records. Missouri Constitutional Convention of 1875, Journal, Vol. 1, pp. 340–341, 352–354, Debates, Vol. 4, pp. 516–518, Vol. 5, pp. 178–191; Missouri Constitutional Convention of 1945, File No. 16, §§ 8 and 10, File No. 17, §§ 35, 36 and 37, Journal, June 12, 1944, p. 15, July 6, 1944, p. 7, Debates, pp. 3118, 3121–3126, 3308–3309.[3]

---

3. In presenting the report of the committee on the executive department of the 1945 Constitutional Convention, Delegate M. E. Ford, chairman of the committee, stated that § 8 of File 16 "is the same as the section in the old constitution."

Page 3122. The section was perfected without any amendment or discussion. After the chairman had presented § 10 of the report, this occurred: "Mr. Phillips (of St. Louis City): Section 8 covers joint resolutions. Now, you have got

As previously noted, the respondent concedes that the General Assembly can, by a joint or concurrent resolution, set up an investigatorial committee to function while the General Assembly is in session without submitting the resolution to the governor for his consideration; however, if the meaning of these §§ 31 and 8 is as broad and inclusive as the respondent claims, then it would seem that all joint resolutions and concurrent resolutions, even those to be effective and completely performed during the legislative session, must be either approved by the governor or passed over his veto as in the case of a bill. These sections, 31 and 8, do not make the distinction implied in respondent's concession. If these sections apply to *all* joint or concurrent resolutions, then the time when the functions or purposes of the resolution are to be consummated would be immaterial. This would also raise a question as to the time the resolution would be effective. If respondent's view is correct, then either

house apparently could do by independent action, because not prohibited by the constitution, what the General Assembly could not do by joint or concurrent action.

As we have seen, the Constitution of the United States, art. I, § 7, cl. 3, provides that every order, resolution or vote to which the concurrence of both houses may be necessary, shall be presented to the President of the United States. The meaning of this provision was the subject of an opinion by the attorney general of the United States, reported as Resolutions of Congress, in 6 Opinions of Attorney General, p. 680. It is therein stated that a joint resolution, although differing in form from an act of Congress, may have the same effect, and further it is stated, loc. cit. 682: "And the Constitution expressly provides that orders and resolutions, and other votes of the two Houses, *in order to have the effect of law,* shall, in like manner, be presented to the President for his approval, and if not approved by him *shall*

---

a provision in Section 10 for joint resolutions. It looks to me like if you are going to have joint resolutions in Section 10 you don't need Section 8 at all. The only thing I can see of value in Section 8 is the thing that is a law anyway that a resolution can't have the effect of a law.

"Mr. Ford: The only difference Section 8 makes it necessary to present them to the governor and Section 10 says what he shall do with them after they are presented. If the Committee on Phraseology is certain that everything is included in that, why of course I would have no objection, but I wouldn't want to say offhand that that should be done, Senator.

"Mr. Phillips (of St. Louis City): Well, I was just trying to prepare the way for it, Mr. Ford. That is the way it looks to me.

"Mr. Phillips (of Jackson): Mr. President, the clause in Section 10 concerning joint resolutions was taken from the old Constitution. Conceivably there might be a circumstance where the governor desired to veto some matter in a joint resolution, but let me make a statement for a matter of information. We adopted a few minutes ago, or approved, Section 8. To my knowledge over all of the years that I have had any

contact with the General Assembly no joint resolution has ever been forwarded to a governor for his consideration except joint resolutions which were adopted at the beginning of each session for the purpose of authorizing a temporary expenditure of money for a six months period until the General Assembly would make the regular appropriations. * * I was thinking awhile ago when we reached Section 8 that that was absolutely a surplus section of the Constitution so far as practice is concerned. The governor never has seen, and on one occasion we tried to go back into history to find whether at any time since 1875 had joint resolutions of the General Assembly ever been presented to the governor, and we couldn't find them. On various types of matters, do you think the governor wants to be bothered with those joint resolutions that the Senate and the House of Representatives are passing? They are never presented as a matter of practice, so that shows how obsolete our Constitution may be and how we may perpetuate it if we desire to do so." Pages 3123-24. Later it was decided that the coordinating of the sections should be left to the Committee on Phraseology, Arrangement and Engrossment. Page 3309.

*become law* only by subsequent concurrence in vote of two-thirds of the Senate and House of Representatives." (Emphasis supplied.) The construction and application given to a similar provision of the federal constitution is strongly persuasive in the construction and application of a like provision in our state constitution. Star Square Auto Supply Co. v. Gerk, 325 Mo. 968, 30 S.W.2d 447, 456 [7]. See also Cannon's Procedure in the House of Representatives (1951), p. 228, and references to Jefferson's Manual, § XXI, Hind's Precedents and Cannon's Precedents.

■ We believe that the constitution of Maine* expresses what is implied in the Missouri constitution when it limits the resolutions that have to be submitted to the governor to those *"having the force of law."* (Emphasis supplied.) It is our conclusion and holding that joint resolutions, as that term is used in art. III, § 31, and the concurrent resolutions mentioned in art. IV, § 8, are those resolutions which have the force and effect of law. In this view we are further supported by the distinction drawn between legislative and procedural acts in Gilbreath v. Willett, 148 Tenn. 92, 251 S.W. 910, 28 A.L.R. 1147, and Attorney General v. Brissenden, 271 Mass. 172, 171 N.E. 82. Although Alabama has a constitutional provision similar to that of Missouri, no contention was made in In re Opinion of the Justices, 248 Ala. 590, 29 So.2d 10, that the resolution creating the interim investigatory committee should have been submitted to the governor.

■ This holding is in keeping with the general practice in the General Assembly of Missouri from time immemorial, as a brief perusal of the journals of the General Assembly will disclose. While the practice does not make the law, the legislative interpretation placed upon a constitutional provision may be taken into consideration by the courts as persuasive of what was intended where an ambiguity exists. State ex rel. Oliver v. Hunt, Mo., 247 S.W.2d 969; State ex inf. McKittrick

ex rel. Ham v. Kirby, 349 Mo. 988, 163 S.W.2d 990.

■ In approving or vetoing an act of the General Assembly, the governor acts in a legislative capacity. 82 C.J.S., Statutes, § 47, p. 74. The veto power is in derogation of the general plan of state government and it must be strictly construed to those instances where it is "expressly directed or permitted." Art. II, § 1; Brown v. Morris, Mo., 290 S.W.2d 160, 169 [20].

■ The question, then, is whether Senate Concurrent Resolution No. 10 has the force and effect of law. A court will look through the form of a parliamentary maneuver and determine the substance regardless of whether the term "concurrent resolution," "joint resolution" or "bill" is used. Kelley v. Secretary of State, 149 Mich. 343, 112 N.W. 978, 979.

■ Generally, it may be said that a legislative body uses a resolution to express an opinion or purpose with respect to a given matter or thing and it is temporary in nature, while a law is intended to direct and control permanently matters applying to persons and things in general. This definition has been variously expressed in: City of Cape Girardeau v. Fougeu, 30 Mo. App. 551, 557; Ex parte Hague, 104 N.J. Eq. 31, 144 A. 546, 559; Chasis v. Tumulty, 8 N.J. 147, 84 A.2d 445, 449 [3]; Scudder v. Smith, 331 Pa. 165, 200 A. 601, 604; Steward v. Rust, 221 Ark. 286, 252 S.W.2d 816; Wilder v. American Produce Co., Tex.Civ.App., 147 S.W.2d 936, 938.

■ It is our opinion that the resolution presently before us, Senate Concurrent Resolution No. 10, is administrative or procedural in character and that it does not have the force and effect of law. Its submission to the governor was not required by the constitutional provisions in question. It is an attempt to carry the investigative work of its committee beyond the adjournment of the legislature. If such work is administrative and the proper subject of a concurrent resolution while the general

assembly is in session, its essential character is not changed by reason of adjournment. It was temporary in its nature; it did not purport to establish a permanent rule of government, but was auxiliary or incidental to the legislative process.

■ Nor do we think that the resolution undertakes to appropriate money. The appropriation for the contingent fund of the General Assembly was by a bill duly enacted into law. The expressed purpose of the appropriation is "to pay the contingent expenses and to pay the salaries of elective and appointive officers and other employees of the General Assembly for the period beginning July 1, 1955 and ending June 30, 1957." Laws of Missouri 1955, p. 196, § 12.020. The time when the committee met is within the period covered by the appropriation act.

The remaining question is whether the terms of Senate Concurrent Resolution No. 10 are sufficiently definite to authorize the committee to sit as an interim committee. The weight of authority is that, in order to authorize a legislative committee to sit after adjournment sine die, the resolution must explicitly so provide or the implication must be clear and unmistakable. In re Davis, 58 Kan. 368, 49 P. 160; Commercial & Farmers' Bank v. Worth, 117 N.C. 146, 23 S.E. 160, 30 L.R.A. 261; Marshall v. Harwood, 7 Md. 466; 49 Am. Jur., States, Territories and Dependencies, § 41, p. 258. We believe the rule is salutary and should be followed in this state. This goes to the power and authority of the committee, in fact, to its very existence, and should not be left to speculation. Senate Concurrent Resolution No. 10 makes no provision as to when or where the committee shall sit. The relator contends that the fact that the committee was directed to submit its report to the Sixty-ninth General Assembly and the committee members were not appointed until May 31, the date when the General Assembly adjourned, was sufficient basis for an implication that the committee was to sit after adjournment.

With this we cannot agree. The concurrent resolution was adopted by the Senate on May 2 and by the House on May 6, and the members of the General Assembly were entitled to be informed of this unusual grant of power at the time they voted on the question. The public generally, and especially the persons with whom the committee deals, are entitled to this information. The resolution does not meet the standard of the rule. Because of this deficiency Senate Concurrent Resolution No. 10 was not a valid authorization of the committee to function after adjournment sine die. Our opinion as to the operative sufficiency of the resolution is limited to the single question raised.

Because of the defective exercise of the authority possessed by the General Assembly, the respondent, on the record before him, was justified in refusing to approve the expense account of the relator in cause No. 45,780. It follows that the alternative writ of mandamus granted in that case should be quashed.

Since the Senate, acting alone, did not have authority to create the interim committee contemplated by Senate Resolution No. 100, the alternative writ of mandamus issued in cause No. 45,622 is quashed.

WESTHUES, J., and DALTON, C. J., concur.

HOLLINGSWORTH, J., concurs in part and dissents in part in separate opinion filed, in which separate opinion LEEDY, EAGER, and HYDE, JJ., concur.

PER CURIAM.

In accordance with the above vote the alternative writ in Case No. 45,622 is quashed and the alternative writ in Case No. 45,780 is made peremptory.

HOLLINGSWORTH, Judge.

 I concur in everything said in the opinion of STORCKMAN, J., except his conclusion that Senate Concurrent Resolution No. 10 does not carry within its context a clear and unmistakable implication that the joint committee therein created sit in the interim between sessions of the Sixty-eighth and the Sixty-ninth General Assemblies.

The resolution, on its face, envisions a task that scarcely could be launched and certainly not completed within the period beginning May 6, 1955, and ending May 31, 1955. The committee is directed "to investigate the problems of juvenile and youthful offenders under twenty-one years of age and the laws, practices, procedures and services relating thereto", and to "prepare and submit a report to the Sixty-ninth General Assembly together with such recommendations as it deems appropriate." Provision is made for research and for the creation of advisory committees of interested citizens. Extended hearings are contemplated and rules of procedure are to be promulgated. The provision for payment of the expenses of the members of the committee out of the contingent fund indicates that their labors may take them beyond the confines of the State Capitol and the provision for payment of other committee expense indicates the use of services beyond those usually rendered by the regular employees of the then current (Sixty-eighth) General Assembly.

Therefore, although the resolution does not specifically define the power of the committee to sit between the sessions of the Sixty-eighth and Sixty-ninth General Assemblies, as, of course, should every resolution investing a committee with interim powers, yet, I am convinced that, in this instance, the power of the committee to sit in interim is so clearly and unmistakably implied as to admit of no other reasonable interpretation. Consequently, the alternative writ in case No. 45,780 should be made peremptory.