Kenneth M. WEINSTOCK, Respondent/Cross–Appellant,

v.

Bob HOLDEN, Treasurer for the State of Missouri, and Jeremiah Nixon, Attorney General for the State of Missouri, Appellants/Cross–Respondents,

and

Senator John D. Schneider, Respondent.

No. 81322.

Supreme Court of Missouri, En Banc.

June 1, 1999.

Rehearing Denied June 29, 1999.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen King Mitchell, Paul R. Maguffee, Asst. Attys. Gen., Jefferson City, for respondent/cross-appellant.

Louis J. Basso, St. Louis, for appellants/cross–respondents.

Senator John D. Schneider, John E. Bardgett, Marc Ellinger, Jefferson City, for respondent.

## PER CURIAM.

Article XIII, section 3 of the Missouri Constitution was adopted by the voters of Missouri as a part of their Constitution in 1994. The article establishes a Citizen's Commission to review, study, and fix the relationship of compensation to the duties of all elected state officials, legislators, and judges. The schedule of compensation established by the Citizen's Commission is "effective" if not disapproved by the general assembly, but "subject to appropriations". Kenneth Weinstock brought this lawsuit to challenge the legislature's disapproval of the Citizen's Commission's 1996 schedule of compensation.[1] He also attacks the validity of an amendment allowing an increased per diem to legislators and judges. The trial court denied relief.

We affirm the judgment of the trial court and hold that: 1) legislative disapproval of a Citizen's Commission's schedule of compensation must be done in accordance with article III, section 21 of the Missouri Constitution because the disapproval has the force and effect of law; 2) no affected officeholder in Missouri is entitled to an increase in compensation until the general assembly appropriates an amount to fund all or a pro rata portion of the schedule of compensation; 3) the general assembly cannot appropriate a per diem expense allowance, payable in the nature of a salary, independent of the provisions of article XIII, section 3; and 4) the general assembly may, however, appropriate amounts for the reimbursement of the reasonable and necessary actual expenses of its members pursuant to article II, section 1 and article III, section 16 of the Missouri Constitution.

## I.

Weinstock served as a circuit court judge in St. Louis County from June 7, 1984, until November 13, 1997. Weinstock is now entitled to receive retirement benefits computed in accordance with section 476.530, RSMo 1994. Weinstock is also a taxpayer in the State of Missouri.

Bob Holden is the Treasurer of the State of Missouri. He is responsible for making disbursements from the state treasury in accordance with the law.

Jeremiah Nixon is the Attorney General of the State of Missouri. He is responsible for enforcing and defending the laws of the state.

---

1. A copy of the Missouri Citizen's Commission's 1996 Report and Compensation Schedule is attached as Appendix A.

John D. Schneider is a Senator who represents the 14th senatorial district of the State of Missouri.

Weinstock claims that the general assembly failed to lawfully disapprove the schedule of compensation adopted by the Missouri Citizen's Commission in 1996 and that he is entitled to receive state benefits computed in accordance with that schedule. In the alternative, Weinstock claims that the general assembly improperly increased its own per diem in disregard of the provisions of article XIII, section 3.

The trial court granted summary judgment against Weinstock on both claims. We have jurisdiction pursuant to article V, section 3 of the Missouri Constitution.[2]

## II.

Prior to November 8, 1994, compensation for Missouri executive officers, legislators, and judges was determined through the traditional legislative process. Because of the obvious pressures involved with setting their own compensation, state elected officials confronted a difficult if not impossible task. As a result, salaries for elected officials and judges have little relation to the market place. Anomalies existed and remain present, generally with state employees whose compensation is determined through the legislative process being paid less than individuals in comparable public and private positions. For example, the 1998 compensation for the governor of Missouri was only $107, 269, approximately 55% of the $195,000 compensation for the president of the University of Missouri or of the $200,000 compensation for the superintendent of the Kansas City School District.

House Joint Resolution No. 38 (HJR 38) was introduced in an attempt to remedy this problem. It was initially drafted to remove the schedule of compensation for executive officeholders, legislators, and judges entirely from the legislative process, "to ensure that the power to control

the rate of compensation of elected officials of this state is retained and controlled by the taxpaying citizens of this state." HJR 38 sought to create a new constitutional entity, the Citizen's Commission, that would hold hearings across the state and then establish a schedule of compensation for the affected officeholders. HJR 38 provided that the schedule could only be challenged by "referendum upon petition of the voters".

Two pertinent amendments were made to HJR 38 on its path through the general assembly. First, the words "subject to appropriations" were added to section 8 of the resolution (House Amendment No. 4.) Second, a sentence was added stating, "The schedule of compensation shall become effective unless disapproved by concurrent resolution adopted by the general assembly before February 1 of the year following the filing of the schedule." (Senate Amendment No. 4.) Unfortunately, no attempt was made during the legislative process to reconcile these two amendments with each other or with the remainder of the resolution that was otherwise drafted without contemplation of any role by the general assembly.

As submitted to and adopted by the voters of Missouri, HJR 38 amending article XIII of the Constitution contained the following relevant provisions:

> ...[I]n order to ensure that the power to control the rate of compensation of elected officials of this state is retained and exercised by the tax paying citizens of the state, ... no elected state official, member of the general assembly, or judge, ... shall receive compensation ... other than in the amount established for each office by the Missouri citizen's commission.... The term "compensation" includes the salary rate established by law, mileage allowances, per diem expense allowances.

*Mo. Const. art. XIII, sec. 3.1.*

---

2. In *Weinstock I,* we noted the necessity of our deciding this case. *Weinstock v. Holden,* 995 S.W.2d 408 (Mo. banc 1999).

The commission shall, ... every two years ... review and study the relationship of compensation to the duties of all elected state officials, all members of the general assembly, and all judges, ... and shall fix the compensation for each respective position.

\* \* \* \* \*

The schedule of compensation shall become effective unless disapproved by concurrent resolution adopted by the general assembly before February 1....

\* \* \* \* \*

The schedule shall, subject to appropriations, apply and represent the compensation for each affected person....

\* \* \* \* \*

In addition to any compensation established by the schedule, the general assembly may provide by appropriation for periodic uniform general cost-of-living increases or decreases for all employees of the state of Missouri and such cost-of-living increases or decreases may also be extended to those persons affected by the compensation schedule fixed by the commission.

*Mo. Const. art. XIII, sec. 3.8.*

Schedules filed by the commission shall be subject to referendum upon petition of the voters....

*Mo. Const. art. XIII, sec. 3.11.*

The entire text of article XIII, section 3 of the Constitution is set forth in Appendix B.

### III.

The Missouri Citizen's Commission timely filed its first schedule of compensation on November 30, 1996. *Laws of Missouri, 1997,* pp. 1492–3, attached as Appendix C. The schedule provided for increases in compensation for legislators and judges and a per diem expense increase. On January 9, 1997, Senate Concurrent Resolution 3 (SCR 3) was introduced and first read in the senate. SCR 3 stated that the schedule of compensation was excessive and sought to disapprove it. SCR 3 proceeded through the senate in accordance with the provisions of article III, section 21, *et seq.* It was duly assigned to and reported out of committee, read on second and third separate days and adopted in the senate. As recorded in the House Journal, however, SCR 3 was not "read by title on three different days" in the house of representatives before being passed on January 28, 1997. SCR 3 was presented to the Governor and signed on January 29, 1997.

In 1997, the general assembly also passed Senate Bill 299. Senate Bill 299 amended section 21.145, RSMo 1994, to change the daily expense allowance available to each senator or representative from "the amount of $35 per day" to "an amount not to exceed eighty percent of the federal per diem." The precise language of the amended section 21.145 provides: "Each senator or representative shall be reimbursed from the state treasury for actual and necessary expenses in an amount not to exceed 80% of the federal per diem established by the Internal Revenue Service for Jefferson City for each day on which the journal of the senate or house, respectively, shows the presence of such senator or representative." (Emphasis added.) Senate Bill 299 also amended section 476.380 to provide the same benefit to judges attending the annual 1–2 day judicial conference.

### IV.

■ Article III, sections 21–32 of the Missouri Constitution establish a number of procedural requirements concerning the manner in which the general assembly may exercise its legislative function of enacting laws. It is acknowledged by all of the parties that article III, section 21 requires that "No law shall be passed except by bill ..." and that "Every bill shall be read by title on three different days in each house." The purpose of these requirements is clear. Both the public and the members of the legislature are entitled to a minimal amount of time to learn of,

consider, and respond to any proposed lawmaking.

The House Journal establishes that SCR 3 was read in the house of representatives only on two different days, not three, prior to its being passed. The state argues that the three-day requirement of article III, section 21 is not applicable because article XIII, section 3.8 requires that the Citizen's Commission's schedule of compensation be disapproved by "concurrent resolution" and article IV, section 8, instead, controls the procedure for enacting concurrent resolutions. Article IV, section 8 reads:

> Every resolution to which the concurrence of the senate and house of representatives may be necessary, . . . shall be presented to the governor, and before the same shall take effect, shall be proceeded upon in the same manner as in the case of a bill; . . . .

The state contends that the Constitution provides no procedural requirements for concurrent resolutions prior to presentment to the governor. Weinstock and Schneider argue, however, that the requirement in article IV, section 8 that concurrent resolutions "shall be proceeded upon in the same manner as in the case of a bill" refers back to and incorporates the article III, section 21, *et seq.* requirements, including the requirement of reading "on three different days in each house".

■ Neither argument precisely hits the mark. Article IV, section 8 discusses the post-presentment procedural requirements of "concurrent resolutions" from the governor's perspective. *See, State ex rel. Royal Ins. v. Director of Missouri Dep't of Ins.,* 894 S.W.2d 159, 162 (Mo. banc 1995); *Bohrer v. Toberman,* 360 Mo. 244, 227 S.W.2d 719, 723 (banc 1950). As a section in the executive department article, however, article IV, section 8 does not speak to the procedural requirements applicable to the legislative department, which are set out in article III. Article III does not specifically define what "joint resolutions" or "concurrent resolutions" are. Neither does article III set out what procedures are to be followed by the legislature concerning "joint resolutions" or "concurrent resolutions," nor does it authorize the general assembly to legislate by "joint resolutions" or "concurrent resolutions". It speaks only to "bills".

Our case law has addressed this issue in detail. In *State ex rel. Jones v. Atterbury,* 300 S.W.2d 806, 817 (Mo. banc 1957), we stated that:

> A court will look through the form of a parliamentary maneuver and determine the substance regardless of whether the term "concurrent resolution," "joint resolution" or "bill" is used.

In *Atterbury,* and in *Padberg v. Roos,* 404 S.W.2d 161 (Mo. banc 1966), which followed, the Court held that the requirements for legislative action set out in article III were limited to situations when the general assembly was acting in a "legislative capacity". Correspondingly, we have recently held in *Mo. Coalition for Environment v. Joint Committee on Administrative Rules,* 948 S.W.2d 125, 134 (Mo. banc 1997), that:

> . . . legislative actions, whether by committee, by resolution of one house, or by joint resolution of the whole legislature, cannot amend, modify, rescind, or supplant any rule promulgated by an agency unless the legislature follows the bill passage requirements.

\* \* \* \* \*

A preemptive action of the legislature, whether such action be suspension of a rule, revocation of a rule, or prior approval of a proposed rule, must be a "legislative" action.

Here, the legislature was attempting to disapprove a schedule of compensation submitted by the Citizen's Commission, a constitutional body. The schedule otherwise would have become effective February 1, 1997. As such, this was legislative action with the force and effect of law. The legislature was bound to follow the requirements for legislative actions set out in article III, section 21, *et seq.,* including

the article III, section 21 requirement that the measure be read by title on three different days in each house. Because the house of representatives did not read SCR 3 by title on three different days, the resolution was not validly approved and the Citizen's Commission's schedule of compensation became effective on February 1, 1997.

## V.

■ Because the general assembly failed to validly disapprove the Citizen's Commission's schedule of compensation, it became "effective" on February 1, 1997. This, however, does not end our analysis. Effect must still be given to the remainder of section 3 of article XIII. This is a difficult task given that the two amendments, House Amendment No. 4 and Senate Amendment No. 4, do not fit smoothly within the whole of that section.

As section 3 of article XIII was originally proposed, it is clear that the general assembly would have played no role in the compensation process. The introductory language in article XIII, section 3.1, stated that its purpose was "to ensure that the power to control the rate of compensation of elected officials of this state is retained and exercised by the tax paying citizens of the state". A Citizen's Commission made up of representative citizens, not elected officials, was to be selected to establish a schedule of compensation. *Mo. Const. art. XIII, subsections 3.2–.7.* The schedule of compensation was to be published as a part of the "session laws of the general assembly". *Mo. Const. art. XIII, sec. 3.8.* No provision was made for a salary other than that set out in the schedule of compensation after July 1, 1997. *Mo. Const. art. XIII, sec. 3.10.* And, finally, the schedule was made "subject to referendum" as its sole check and balance. *Mo. Const. art. XIII, sec. 3.11.*

House Amendment No. 4 and Senate Amendment No. 4 to the proposed article indicate the unwillingness of each respective house to allow this power to be removed completely from the legislature. The solution adopted in the senate was to allow the legislature up until February 1 to disapprove the schedule. The house solution was simply to make the schedule "subject to appropriations". Both amendments were ultimately adopted, apparently with little consideration of their effect upon each other or upon the remainder of the section. Regardless, we are bound to harmonize these two amendments and to give each, and the remainder of article XIII, section 3, full meaning and effect to the extent possible. *Bank of Washington v. McAuliffe*, 676 S.W.2d 483, 485 (Mo. banc 1984); *State Highways and Transp. Comm' v. Director, Missouri Dep't of Revenue*, 672 S.W.2d 953, 955 (Mo. banc 1984). We must determine what it means for a "schedule of compensation" to be "effective" yet still "subject to appropriations".

Weinstock argues that because the "schedule of compensation" is "effective", the additional "subject to appropriations" language is largely ministerial, dependent only upon sufficient state funds to reach "civil lists" in accordance with article III, section 36. We believe this argument overreads the term "effective" and underreads the term "subject to appropriations".

There can be no doubt that if the "schedule of compensation" filed by the Citizen's Commission is not "disapproved" before February 1, it becomes "effective" and that these terms must have a meaning. As article XIII, section 3.8 continues, the "schedule" is to be published "as a part of the session laws of the general assembly" and as "a part of the revised statutes of Missouri." *See, Laws of Missouri, 1997,* pp. 1492–3 attached as Appendix C; *RSMo Supp.1998*, pp. 3153–4, attached as Appendix D. It is the "schedule" that "subject to appropriations" applies to and represents each affected person's compensation. We can only conclude that an "effective" "schedule of compensation", as a matter of law, establishes "the relationship of compensation to the duties of all elected state officials, all members of the general assembly, and all judges," and "fix[es] the compensation for each respective position." *Mo. Const. art. XIII, sec. 8.*

The practical value of any "schedule of compensation" to an affected person, however, may be somewhat minimal. Although the schedule establishes the appropriate level of compensation for each position and the relationship of the compensation amounts for all of the positions relative to each other, we must also allow the words "subject to appropriations" to have their full meaning. Those words allow the legislature to choose, in each of the two years covered by the schedule, whether to fund the "schedule of compensation" in whole or pro rata part, subject only to article V, section 20. Only after appropriation does the schedule become "the compensation for each affected person" in the sense that it is legally enforceable.

In 1997, the legislature made no additional appropriation to fund any increase proposed by the "schedule of compensation". Therefore, Weinstock had no enforceable right to any corresponding increase in his individual compensation. Retirement benefits, pursuant to section 476.530, are calculated at fifty percent of the "compensation provided by law" at the time of the judge's retirement. Weinstock's "compensation" at retirement was not increased solely by the schedule of compensation becoming effective without additional appropriation by the legislature. The trial court was correct in granting summary judgment against him on this claim.

## VI.

Weinstock also makes an alternative claim as a taxpayer. He challenges the appropriation of state funds for the increase in the expense allowance pursuant to S.B. 299, passed in 1997. He argues that article XIII, section 3.1 defines "compensation" as including "the salary rate established by law, mileage allowance, [and] per diem expense allowances" and that article XIII, section 3.1 is the exclusive method by which the "compensation"

of the affected state employees may be established. He maintains that if the legislature did not fund the "schedule of compensation" by appropriation for any other affected individuals, it could not fund the schedule only for its own per diem.

Weinstock's argument has merit regarding its interpretation of article XIII, section 3. Because the section refers almost exclusively to a "schedule of compensation" and the "schedule" establishes the "relationship of compensation to the duties of all elected state officials, all members of the general assembly, and all judges," and because it is the "schedule" that is "subject to appropriations", the legislature may not pick and choose individuals or individual offices or individual departments of government for increases.

For example, the legislature could not choose to increase compensation only for its members who voted a particular way on a given bill, for members of a particular political party, or for members from particular geographic regions. Neither could the legislature choose to increase compensation in accordance with the schedule only for certain executive officeholders or for certain judges, but not for others. "Schedule" means an entity or package. A schedule is not a schedule if the legislature is free to pick and choose from the list which positions to fund partially and which to fund fully. If the latter were true, the Citizen's Commission would simply have established a series of salary "caps", not a schedule of compensation.

The entire appropriations process is, of course, a means of allocating resources among the various functions of state government. Those in charge of appropriations must decide the relative worth of social services, education, agricultural programs, public safety, corrections, operations of the executive office and the general assembly – to name but a few – and to fund these governmental activities within a balanced budget. To give full meaning to the phrase "subject to appropriations"[3] is

---

3. That "appropriations" is plural, not singular, does not help to discern its meaning be-

cause each schedule of the Citizen's Commis-

not to mandate that the general assembly must fund schedule increases subject only to article III, section 36, but to allow the general assembly the discretion to fund the cost of the schedule in whole, in part, or not at all, in accordance with its sense of values and priorities. However, the general assembly's discretion is limited to funding the schedule as a whole, not to redetermining the relationships established by the Citizen's Commission. If only a certain portion of the total schedule is funded, each position and item on the schedule must be given the same pro rata treatment. Any amounts appropriated to the schedule must be applied to increase existing compensation levels by the same pro rata amount from existing compensation toward the effective scheduled amount.

■ The constitutional provision also specifies that the legislature is free to grant, in addition to the schedule of compensation, "periodic *uniform* general cost-of-living increases or decreases for all employees of the state of Missouri and *such* cost-of-living increases or decreases may also be extended to those persons affected by the compensation schedule . . ." whether or not the schedule is effective or funded. *Mo. Const. art. XIII, sec. 3.8.* Designation of the cost-of-living (COLA) benefit that may be extended as one that is "uniform" "for all employees" cannot be ignored. As a "uniform" benefit it must be extended uniformly. No authority is allowed the legislature to extend this benefit other than on a "uniform" basis to those individuals affected by the schedule. Otherwise, the legislature could negate an "effective" schedule established by the Citizen's Commission by granting COLA increases to some but not to others. While the legislature is free to fund COLA increases, or not, for individuals covered by the schedule, whatever amount is appropriated must be *uniform* to all. To hold otherwise would allow the legisla-

ture to destroy the Citizen's Commission's schedule by altering the relationships of the various offices included by the use of disproportionate COLAs.

Article XIII contemplates a single "schedule of compensation" that is to be funded in whole or in pro rata part to obtain the "relationship of compensation" established by the Citizen's Commission in relation to the duties of those affected. Had the legislature attempted to fund only the per diem in accordance with the Citizen's Commission's schedule, but disregarded the remainder of the schedule, it would have violated article XIII, section 3.8. *See also, Mo. Const. art. II, sec. 1.*

It does not appear, however, that the legislature sought to rely upon article XIII, section 3.8 as authority for increasing the expense allowance. S.B. 299 was passed after the general assembly purportedly disapproved the Citizen's Commission's schedule of compensation. Nor was S.B. 299 exclusive to members of the general assembly; it also provided an expense allowance for judges attending the annual 1–2 day judicial conference.

S.B. 299 amended sections 21.145 (legislative per diem) and 476.380 (judicial per diem). Prior to their amendment, section 476.380 authorized a per diem *"not to exceed* thirty-five dollars per day" for certain expenses of judges, while section 21.145 authorized a per diem *"in the amount* of thirty-five dollars per day", regardless of the actual expense involved for legislators. Some legislators actually may have spent more, while others may have spent less. After the enactment of S.B. 299, the amended version, however, adopted the *"not to exceed language"* for both judges and legislators authorizing only "actual and necessary expenses *in an amount not to exceed* eighty percent of the federal per diem." (Emphasis added.) Thus, under the amended statutes, a judge attending the judicial conference or a legislator at-

---

sion is subject to appropriation in each of two succeeding years. Thus, the word "appropriations" in the plural means nothing other

than the recognition that the compensation schedule is subject to two annual appropriations.

tending sessions of the general assembly is entitled only to his or her "actual and necessary expenses" not to exceed 80% of the federal per diem rate.

The payment of actual and necessary expenses of legislators and judges is not prohibited by any provision of the constitution. Indeed, article III, section 16, specifically provides, "Until otherwise provided by law, each senator or representative shall be reimbursed from the state treasury for actual and necessary expenses incurred by him in attending sessions of the General Assembly." Moreover, article V, section 21, provides, "Judges may receive reasonable traveling and other expenses allowed by law." In addition, article II, section 1, provides that that the "powers of government shall be divided into three distinct departments – the legislative, executive and judicial – each of which shall be confided to a separate magistracy, . . . ." In this regard, we have long recognized the inherent power within each department to accomplish its respective duties. *Clark v. Austin*, 340 Mo. 467, 101 S.W.2d 977 (banc 1937); *In re Richards*, 333 Mo. 907, 63 S.W.2d 672 (banc 1933); *In re Pate*, 107 S.W.2d 157 (Mo.App.1937). An element of this power is the right of each department of government to the reasonable and necessary actual expenses to do that work constitutionally required of it.

We acknowledge that article XIII, section 3.1 begins with the phrase "Other provisions of this constitution to the contrary notwithstanding". This language, however, does not mitigate against our duty to read article XIII, section 3, consistent with the remainder of the Missouri Constitution. The phrase applies, by its terms, only to the other provisions of the Constitution that are "to the contrary" and not possible of harmonization. *Consolidated School Dist. No. 1 of Jackson County v. Jackson County*, 936 S.W.2d 102, 104 (Mo. banc 1996); *State ex rel. Upchurch v. Blunt*, 810 S.W.2d 515, 516 (Mo. banc 1991); *State ex rel. Jones v. Atterbury*, 300 S.W.2d 806, 810 (Mo. banc 1957). A number of other constitutional provisions are relevant to the interpretation of article XIII, section 3 and can be read in harmony with it: article II, section 1; article III, section 16; article III, section 21, *et seq.*; article III, section 36; article IV, section 8; article V, section 20; and article V, section 21.

The purpose of article XIII, section 3 was to return the power of setting the salaries of state elected officials, legislators, and judges to the people in the form of the Citizen's Commission. Allowances for per diem payments that are not tied to reasonable and necessary actual expenses, and that are not allowed on the same basis to all other state employees, are in the nature of compensation and cannot be allowed except pursuant to article XIII, section 3. However, reimbursement of reasonable and necessary actual expenses allows article XIII, section 3 to be read consistently with article III, section 16; article V, section 20; and article II, section I. This is no different than allowing individuals covered by article XIII, section 3, to benefit from COLA increases along with all other employees of the state, irrespective of the schedule. *See, article XIII, sec. 3.8.*

Because the statute, on its face, authorizes no more than the payment of reasonable and necessary actual expenses, it is not facially unconstitutional. In addition, there is no claim that any judge or legislator was paid more than his or her actual and necessary expenses for daily attendance at the judicial conference or at a legislative session, nor is any claim made that any increase in actual and necessary expenses paid under S.B. 299 exceeded what is paid to all other state employees while attending to state business away from home. Thus, S.B. 299 is not shown to be unconstitutional as applied..

### VII.

The judgment of the trial court is affirmed.

BENTON, C.J., PRICE, COVINGTON,
WHITE, HOLSTEIN and WOLFF, JJ.,
concur.

Appendix

LIMBAUGH, J., concurs in separate
opinion filed.

# 1996 Report

# and

# Compensation Schedule (Appendix A)

# of the

# Missouri Citizens Commission

# on

# Compensation for Elected Officials

# November 30, 1996

1996 Report

and

Compensation Schedule (Appendix A)

of the

Missouri Citizens Commission

on

Compensation for Elected Officials

November 30, 1996

The Missouri Citizens Commission on Compensation for Elected Officials, hereafter designated as the *Commission*, was created by an amendment to the state constitution. The following comprises that amendment:

## MISSOURI STATE CONSTITUTION, ARTICLE XIII - PUBLIC EMPLOYEES

Section 3 Compensation of state elected officials, general assembly members and judges to be set by Missouri Citizens Commission on Compensation—members qualifications, terms, removal, vacancies, duties—procedure. --

1. Other provisions of this constitution to the contrary notwithstanding, in order to ensure that the power to control the rate of compensation of elected officials of this state is retained and exercised by the tax paying citizens of the state, after the effective date of this section no elected state officials, member of the general assembly, or judge, except municipal judges, shall receive compensation for the performance of their duties other than in the amount established for each office by the Missouri citizen's commission on compensation for elected officials established pursuant to the provisions of this section. The term "compensation" includes the salary rate established by law, mileage allowances, per diem expense allowances.

2. There is created a commission to be known as the "Missouri Citizen's Commission on Compensation for Elected Officials." The Commission shall be selected in the following manner:

(1) One member of the commission shall be selected at random by the secretary of state from each congressional district from among those registered voters eligible to vote at the time of selection. The secretary of state shall establish policies and procedures for conducting the selection at random In making the selections, the secretary of state shall establish a selection system to ensure that no more than five of the members shall be from the same political party. The policies shall include, but not limited to, the method of notifying persons selected and for providing for a new selection if any person declines appointment to the commission;

(2) One member shall be a retired judge appointed by the judges of the supreme court, en banc;

(3) Twelve members shall be appointed by the governor, by and with the advice and consent of the senate. Not more than six of the appointees shall be members of the same political party. Of the persons appointed by the governor, one shall be a person who has had experience in the field of personnel management, one shall be a person who is representative of organized labor, one shall be a person representing small business in this state, one shall be the chief executive officer of a business doing an average gross annual business in excess of one million dollars, one shall be a person representing the health care industry, one shall be a person representing agriculture, two shall be persons over the age of sixty years, four shall be citizens of a county of the third classification, two of such citizens selected from a county of the third classification shall be selected from north of the Missouri River and two shall be selected from south of the Missouri River. No two persons selected to represent a county of the third classification shall be from the same county nor shall such persons be appointed from any county represented by an appointment to the commission by the secretary of state pursuant to subdivision (1) of this subsection.

3. All members of the commission shall be residents and registered voters of the state of Missouri. Except as otherwise specifically provided in this section, no state official, no member of the general assembly, no active judge of any court, no employee of the state or any of its institutions, boards, commissions, agencies or other entities, no elected or appointed official or employee of any political subdivision of the state, and no lobbyist as defined by law shall serve as a member of the commission. No immediate family member of any person ineligible for service on the commission under the provisions of this subsection may serve on the commission. The phrase "immediate family" means the parents, spouse, siblings, children, or dependent relative of the person whether or not living in the same household.

4. Members of the commission shall hold office for a term of four years. No person may be appointed to the commission more than once. No member of the commission may be removed from office during the term for which appointed except for incapacity, incompetence, neglect of duty, malfeasance in office, or for a disqualifying change of residence. Any action for removal shall be brought by the attorney general at the request of the governor and shall be heard in the circuit court for the county in which the accused commission member resides.

5. The first appointment to the commission shall be made not later than February 1, 1996, and not later than February first every four years thereafter. All appointments shall be filed with the secretary of state, who shall call the first meeting until the commission is organized. The members of the commission shall organize and elect a chairperson and such other officers as the commission finds necessary.

6. Upon a vacancy on the commission, a successor shall be selected and appointed to fill the unexpired term in the same manner as the original appointment was made. The appointment to fill a vacancy shall be made within thirty days of the date the position becomes vacant.

7. Members of the commission shall receive no compensation for this services but shall be reimbursed for their actual and necessary expenses incurred in the performance of their duties from appropriations made for that purpose.

8. The commission shall, beginning in 1996, and every two years thereafter, review and study the relationship of compensation to the duties of all elected state officials, all members of the general assembly, and all judges, except municipal judges, and shall fix the compensation for each respective position. The commission shall file its initial schedule of compensation with the secretary of state and the revisor of statutes no later than the first day of December, 1996, and by the first day of December each two years thereafter. The schedule of compensation shall become effective unless disapproved by concurrent resolution adopted by the general assembly before February 1 of the year following the filing of the schedule. Each schedule shall be published by the secretary of state as a part of the session laws of the general assembly and may also be published as a separate publication at the discretion of the secretary of state. The schedule shall be also be published by the revisor of statutes as a part of the revised statutes of Missouri. The schedule shall, subject to appropriations, apply and represent the compensation for each affected person beginning on the first day of July following the filing of the schedule. In addition to any compensation established by the schedule, the general assembly may provide by appropriation for periodic uniform general cost-of-living increases or decreases for all employees of the state of Missouri and such cost-of-living increases or decreases may also be extended to those persons affected by the compensation schedule fixed by the commission. No cost-of-living increase or decrease granted to any person affected by the schedule shall exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

9. Prior to the filling of any compensation schedule, the commission shall hold no less than four public hearings on such schedule, at different geographical locations within the state, within the four months immediately preceding the filing of the schedule. All meetings, actions, hearings, and business of the commission shall be open to the public, and all records of the commission shall be available for public inspection.

10. Until the first day of July next after the filing of the first schedule by the commission, compensation of the persons affected by the section shall be that in effect on the effective date of this amendment.

11. Schedules filed by the commission shall be subject to referendum upon petition of the voters of this state in the same manner and under the same conditions as a bill enacted by the general assembly.
(Adopted November 8, 1994)

The Missouri Citizens Commission on Compensation for Elected Officials for the 1996-98 session convened on Thursday, February 29, 1996 in Jefferson City. The original appointments to the Commission were comprised of the following listed individuals. The list depicts their domicile as well as the appointing authority.

| | | |
|---|---|---|
| Charles T. Banks | Kansas City | Sec. of State -Random 5th District |
| Linda Beckmeyer | Hartsburg | Governor |
| Stephen Burch | Rolla | Governor |
| Conny K. Dover | Kirksville | Governor |
| Opal A. Evilsizer | Boxworth | Sec. of State -Random 6th District |
| Cheryl Fanning | Lamar | Governor |
| Gary L. Hahn | Mexico | Sec. of State -Random 9th District |
| Susanne B. Hoffmann | St. Louis | Governor |
| M. Theresa Hupp | Kansas City | Governor |
| Dennis W. Jones | Shell Knob | Sec. of State -Random 7th District |
| Robert Kortkamp | Chesterfield | Governor |
| Jerry L. Leath | Chesterfield | Governor |
| Sandra L. Mallory | St. Louis | Sec. of State -Random 3rd District |
| Timothy D. O'Leary | Kansas City | Supreme Court en banc |
| Raymond H. Portwood | Puxico | Sec. of State -Random 8th District |
| Maria-Alma Rainey-Copeland | Florrisant | Governor |
| Ann Ross | St. Louis | Governor |
| Daniel Sawyer | Kansas City | Governor |
| Donald S. Schwartz | St. Louis | Sec. of State -Random 2nd District |
| Joyce L. Shelby | Osceola | Sec. of State -Random 4th District |
| Kenneth W. Summers | St. Louis | Sec. of State -Random 1st District |
| Barbara Westhues | Moberly | Governor |

During the initial February 29, 1996 meeting, Robert O. Kortkamp was nominated and selected as Chairperson for the Commission by majority vote. Subsequent to his election, the Commission was informed by John Boehm, Deputy Commissioner for Administration, State of Missouri, that a consulting staff could be provided to the Commission to assist them in their task by providing statistics and other vital information relative to compensation. After the Commission reviewed competing proposals and interviewed prospective consultants, Workscience Corporation of Richmond, Virginia was selected to aid the commission in its endeavor. During the second meeting of the Commission, the Honorable Timothy D. O'Leary was selected as Vice-Chairman by majority vote. After several months of service to the Commission, Raymond H. Portwood resigned for personal reasons and was later replaced by Maxine M. Duckett, who also represented the 8th District. In early November, 1996 Mr. Charles T. Banks resigned. As of the date of this writing, he has not been replaced.

Statistical information was provided to the Commission throughout its deliberations from a variety of informed sources in a wide array of topical areas. These included data regarding local, regional and national salaries, especially in the other forty-nine (49) states as well as comparisons to states similar in demographics such as geographic size, population, proximity (the eight contiguous states to Missouri), etc.

The following additional "open to the public" meetings were held in Jefferson City:

March 14, 1996: Representatives of Workscience Corporation made a presentation on compensation topics and statistical analysis. Elements of the judiciary and the Missouri Bar Association made general presentations to the Commission. All judiciary levels under study were represented. These include the Associate Circuit, Circuit, and Appellate levels as well as the Supreme Court.

April 11, 1996: Past and present members of the Senate and House made general presentations as well as interested parties providing overviews of the duties and responsibilities of the Attorney General. Mark.Ward, Deputy Commissioner for Budget and Planning, Office of Administration provided an overview of fiscal considerations.

May 9, 1996: Three sub-committees were created representing focus groups on the judiciary, elected officials and the legislature. Commission members selected one of the three sub-committees on which to serve and then elected chairpersons for the sub-committees. Mr. Timothy O'Leary was elected to chair the judiciary committee, Ms. Theresa Hupp the elected officials committee, and Ms. Ann Ross, the legislative committee.

May 23, 1996: Sub-committees continued to meet and deliberate. Additional information was provided by the judiciary. A presentation was also made on retirement system differences by Mr. Gary Findlay, Executive Director of the Missouri State Employees Retirement System.

Although only four were required by law, in order to provide Missouri citizens the opportunity to voice their opinion in a convenient public forum, five hearings were advertised and held at the following locations and dates.

St. Louis August 26, 1996
Springfield September 9, 1996
Kansas City October 7, 1996
Cape Girardeau October 21, 1996
Kirksville November 6, 1996

Testimony was heard at each location.

Appendix A, 6 of 13

On November 13, 1996 the Commission met in Jefferson City and deliberated once again in the form of sub-committees. Initial sub-committee recommendations were prepared and presented to the entire Commission. After discussion and questions after each sub-committee presentation, the Commission voted and approved the attached schedule of compensation (Appendix A) in accordance with its charge to file its initial schedule of compensation with the Secretary of State and the Revisor of Statutes This report and its Appendix comprise the Commissions findings.

Commission rationale for structural changes in compensation

Judges

One of the tasks of the Commission was to set the salaries for each level of the judiciary. We were mindful of the various considerations that should inform our decision, including the fact that adjustments to judicial salaries have an impact on the taxpayers, who endure the real cost of government. Furthermore, the Commission was obligated to consider the sound administration of justice across the State of Missouri as well as reasonable and fair compensation to those who actually perform the work. In setting salaries, to the extent feasible, we have endeavored to match the nature of the job with its importance to the citizens of the state. This does not mean that judicial salaries should be set at equivalent levels with those salaries available to similarly skilled individuals in the private sector, for we believe that service as a judge is a public calling and a great honor. Sacrifice in compensation is normally assumed and expected when one enters public service. Accordingly, the Commission has striven to achieve a middle ground that is evenhanded in its treatment of judicial officers while best serving the requirements of and maximizing the benefits to the Missouri citizenry.

In arriving at this middle ground, the Commission did not lose sight of the fact that the judicial system competes in the marketplace for the talent that it needs to provide quality personnel and that a less than fair salary will mean that the citizens are apt to suffer. The Commission simply was unwilling to arrive at a salary recommendation which would compromise the quality of the judiciary. The people of Missouri must have a judicial system of which they can be proud. They must also be secure in the knowledge that their judicial system will administer justice in a manner that is considered to be fair and just. Thus, even though the Commission recognizes that it could increase salaries to less than a fair amount and still attract personnel, the persons so attracted would, in the main, be at best mediocre; leading to a judiciary composed of persons whose decisions respecting life, liberty and property would not inspire confidence. Furthermore, we would risk losing our present quality personnel at an ever increasing rate.

None of us want a third-rate judiciary. We require people with the ability to know the law, analyze the law and apply it well; as well as individuals who are sensitive to the fact that the just application of the rule of law is the bulwark of democracy. Such persons set the tone for a model of excellence among the practicing bar. This conversely results in assuring that lawyers practicing before them perform at higher levels and thus, the entire system of justice harvests the benefits. Moreover, judges should possess compassion, understanding and the common sense necessary to provide a sound judicial decision. To recruit and retain such persons requires fair compensation.

To assist with our work, we have been fortunate to receive professional staff assistance. We, thereby, received information and data about the salaries of judges, both state and federal, throughout the country, including those of neighboring states. Furthermore, we have learned of the salaries of others who may be perceived by many to have achieved stature in the legal community, and thus worthy of comparison, such as law deans, law professors, partners in middle to large law firms, corporate lawyers, and experienced civil service lawyers. Additionally, and importantly, we received the assistance of the public through their testimony in the public hearings we held throughout the State of Missouri. These were held in five separate locations and testimony came from a broad cross-section of the community, including academicians, judges, lawyers, corporate attorneys, chief operating officers of corporations, and others. We heard their testimony, including their observations and recommendations. We were told of instances where judges have resigned in order to take employment that, although not equal to the prestige normally associated with being a judge, provided a salary necessary to support their families, pay college tuition, etc. The theme became rather clear; lawyers do not aspire to or become judges for the monetary gain. They become judges for other intrinsic reasons, such as interest in the position and the prestige, the honor, and the service to the community that it offers. However, money will keep lawyers from becoming judges if it prevents them from supporting their families', sending their children to college and the like. This, of course, is the way it should be. We don't want lawyers taking the job for the money, because if they do, they are not of the caliber that we want nor expect. But, we don't want to lose dedicated people because they can't afford to accept the position. We learned, also, that there is a great deal of disparity between what successful trial attorneys make in the practice of law and what we pay our judges. As we noted, some of this disparity is understandable because the job is a public service, but we learned that the degree of disparity is in reality, a major consideration for a person making a decision to become a judge. Thus, in order to attract the persons we want and need, we should lessen the disparity to the point where dedicated people will be able to make the choice to become a judge. Consequently, based on this data, and within the considerations outlined above, the Commission believes that it is appropriate to recommend an increase in compensation for the members of the judiciary.

A considerable amount of testimony was heard regarding the type of work assignments, relative workloads, and the pay of judges. Additionally, pay comparisons were made with private legal firms and others associated with the Missouri Bar. Information was received from additional entities concerned with similar matters. These

were often in the form of recommendations, such as that proposed by the Advisory Commission on the Organization of the Judicial Department, dated December 15, 1995. Recommendation #15 stated that "The salary disparity that exists between Associate Circuit Judges and Circuit Judges should be substantially reduced." The Citizens Commission on Compensation for Elected Officials agrees, and we so recommend. However, we conclude that the tradition of having some difference in compensation among the various levels of the judiciary should be maintained.

The Commission recognizes the service that Associate Circuit Judges provide in keeping current both the Associate Circuit and Circuit Court dockets. The constitutional requirement of one Associate Circuit Judge per county may have resulted in a disproportionate number of Associate Circuit Judges for the amount of traditional Associate Circuit caseload, resulting in Associate Circuit Judges using their down time efficiently by assisting with circuit-level cases. The proposed decrease in the disparity between salaries for Circuit and Associate Circuit Judges is an recognition of the service Associate Circuit Judges provide with circuit-level cases and in accepting transfers to other jurisdictions.

The Commission further recognizes that in counties with multiple Associate Circuit Judges, the number of judgeships designated as Associate or Circuit may have been determined by the General Assembly based on criteria that may not be reflected in current workload. The General Assembly has responsibility for establishing the number of judges in each of these classifications, not the Citizens Commission on Compensation of Elected Officials, nevertheless, those numbers are of significance to this commission in considering compensation structure. We recommend that the General Assembly address the question of the appropriateness of the number of Associate Circuit Court Judges and the number of Circuit Court Judges in the circuits where there is a problem, and adjust the number of Associate Circuit Court Judges or Circuit Court Judges as they deem appropriate.

In general, it is the opinion of the Commission that the salaries of judges should be established at fixed dollar intervals between the various levels of judges rather than by percentages. Over time, structural hierarchical relationships could be maintained by whole dollar increments rather than having disparities exacerbated between the higher and lowest levels by across-the-board percentage increases. The initial schedule calls for the base Supreme Court Judge salary to be $120,000 with a difference between the Supreme Court and the Court of Appeals set at $8,000. Similarly, the difference between the Court of Appeals and the Circuit Court Judges should be $7,000 with a $6,000 difference between the Circuit Court Judges and the Associate Circuit Court Judges. A differential of $2,500 should also be paid to the Chief Justice of the Supreme Court.

Section 476.380, RSMo establishes a $35 per diem for judges attending the Annual Judicial Conference. Section 476.330 makes attendance at the conference mandatory for all judges. The Commission has listed a new per diem standard on the attached schedule which ties the amount of per diem paid to judges to the standard

acceptable Federal per diem rate. The rationale for doing so involves consistency in state government between the recommended legislative per diem (tied to the Federal structure) and the judiciary. It is noted that per diem rates fluctuate each year based on market conditions in the cities in which the expenses occur. While the legislature meets primarily in Jefferson City, the city hosting the judicial conference may differ from year to year. It is the intent of the Commission to compensate on the basis of Federal per diem, which will parallel costs in a given area where the expenses are actually incurred. This increase in per diem should be applied in lieu of Section 476.380, RSMo.

Elected Officials

The impact on taxpayers of any adjustment in compensation for elected officials was strongly considered. Based on comments heard at our Commission and statewide meetings, and comments made by interested taxpayers, it was determined that we should be responsible and conservative with taxpayer's money. Salaries of Missouri's statewide officials were compared with similarly sized and neighboring states. Our conclusion is that elected official salaries are generally in line with similar states. In addition, the Commission is impressed with the quality of office holders in recent years and does not feel that the salaries have precluded qualified candidates from running for statewide offices. However, the Commission has concluded that an adjustment should be made in the salary of the Lieutenant Governor, given the increase in duties assigned to this office in 1992, the fact that it is now a full-time office, and the amount paid in comparison with other positions in the state. Accordingly, the Commission recommends the salaries for elected officials found in Appendix A.

The figures provided in Appendix A are our recommendation for base salaries. We recognize that the legislature, in conjunction with the Governor, can make annual adjustments to all statewide positions pursuant to RSMo. 105.005. Last year the salary adjustment consisted of a structure adjustment and a market progression increase. A structure adjustment is essentially a cost-of-living increase. Market progression increases are generally bestowed to move salaries closer to actual salaries paid in the job market when existing salaries are not competitive. Market progression increases were provided to state employees for the first time in over five years on July 1, 1996 in an attempt to provide salaries that are a closer match to those paid in private industry and to other Missouri public jurisdictions. The most recent statistics available ranked Missouri forty-seven (47) out of fifty (50) states in a rank ordering for average salaries paid to state government workers.

We feel that a structure adjustment is appropriate for these statewide elected officials, but that our analysis (based on a review of similar states) has accounted for the market progression increase. Therefore, given no substantial change in comparative market conditions, we recommend that these positions receive only a structure (cost-of-living) adjustment for FY 98 and FY 99.

Appendix A, 10 of 13

General Assembly

The Commission recognizes the fact that the duties of a legislator are difficult and time consuming and far outweigh the length of service generally associated with being in session. A commitment must be made by each legislator to address constituent's needs at all hours of the day and over the course of an entire year. We also recognize that these duties vary considerably amongst legislators with periodic peaks and valleys in this time commitment. It is the Commission's intent to provide a salary level that allows a citizens legislature and not a full-time professional legislature. We value community closeness and real-world experience. Thus, salary levels are set with part-time work in mind, with the knowledge that other business or vocational time requirements must also be met by individuals working within the legislature.

Of note is the Commission's intent to provide salary and expense or per diem payments at a level to allow independence from special interest groups. We also desire to reduce paperwork and minimize processing costs associated with vouchered expenses. After a review of historical documentation it became evident that the $35.00 per day for food, lodging and miscellaneous expenses is grossly inadequate. The notion of a statutorially fixed reimbursement amount that does not take market conditions into account (actual costs) is archaic at best and certainly may be deemed unfair by those who attempt to live within its means. The Commission desires to eliminate the necessity to tap family or external resources for secondary living expenses. We therefore recommend that per diem payments hereafter be tied to the Federal level established for Jefferson City on an annual basis and that reimbursement for mileage should be tied to reimbursement rates commensurate with all other state employees. Indexing per diem and all other expenses should allow for keeping pace with inflation as well as establishing a clear-cut sense of fairness and the expectation of independence from special interests.

The Commission recognizes that there are increased workloads associated with seven traditional leadership positions in the legislature (Speaker of the House, President Pro Tem of the Senate, Speaker Pro Tem of the House, Majority Floor Leader of the House, Majority Floor Leader of the Senate, Minority Floor Leader the House, Minority Floor Leader of the Senate, and two additional positions; the Senate Appropriations Chair and the House Budget Chair. We have provided pay differentials for positions that appear to warrant pay adjustments at this time in Appendix A. We have decided not to consider any salary differential between Senators and Representatives at this time and anticipate addressing this issue in the 1998 report.

Two base increases have been provided for legislators, one for FY98 and the other for FY99. The Commission's intent is to phase in a salary increase to a level that will allow for more financial independence from special interest groups. We also seek to provide the highest quality of individuals to represent Missouri citizens in its legislature.

## Appendix A
## Compensation Schedule
## (page 1 of 2)

### Judges

| | FY 98 | | FY'99[1] |
|---|---|---|---|
| | Base | Differential | |
| Chief Justice, Supreme Court | $120,000 | $2,500 | |
| Supreme Court | $120,000 | | |
| Court of Appeals Judge | $112,000 | | |
| Circuit Judges | $105,000 | | |
| Associate Circuit Judges | $ 99,000 | | |

### General Assembly

| | FY 98 | | FY 99[2] | |
|---|---|---|---|---|
| | Salary | Differential | Salary | Differential |
| Senator | $32,500 | | $35,000 | |
| Representative | $32,500 | | $35,000 | |
| Speaker of the House | $32,500 | $3,500 | $35,000 | $3,500 |
| President Pro Tem of the Senate | $32,500 | $3,500 | $35,000 | $3,500 |
| Speaker Pro Tem of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the Senate | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor leader of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor Leader of the Senate | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, House Budget Committee | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, Senate Appropriation Committee | $32,500 | $2,500 | $35,000 | $2,500 |

Per diem is to be indexed on the Federal standard (Department of Treasury - Internal Revenue Service)[3]
Mileage is to be indexed to the prevailing State of Missouri - Office of Administration rate as applied for all other state employees.[4]

---

[1] FY99 (July 1, 1998) should be based on FY98 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

[2] FY99 (July 1, 1998) should be based on FY99 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

[3] The city of comparison for per diem is Jefferson City, Missouri.

[4] Standard rates are published in employee handbooks annually.

### Appendix A, 12 of 13

## Appendix A
## Compensation Schedule (page 2 of 2)

Elected Officials

| | FY 98 Base | FY99[5] |
|---|---|---|
| Governor | 104,245.92 | |
| Lt. Governor | 66,780.00 | |
| Secretary of State | 83,621.04 | |
| Attorney General | 90,496.32 | |
| State Treasurer | 83,621.04 | |
| State Auditor | 83,621.04 | |

[5] FY99 (July 1, 1998) should be based on FY98 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

Appendix A, 13 of 13

434 

# ARTICLE XIII
# PUBLIC EMPLOYEES

SECTION
1 Medical benefits may be authorized for state officers, employees and their dependents
2 Medical benefits may be authorized for political subdivision officers, employees and their dependents
3 Compensation of state elected officials, general assembly members and judges to be set by Missouri Citizens Commission on Compensation - members qualifications, terms, removal, vacancies, duties - procedure

Section 1. Medical benefits may be authorized for state officers, employees and their dependents.—Other provisions of this constitution to the contrary notwithstanding, the general assembly may provide or contract for health insurance benefits, including but not limited to hospital, chiropractic, surgical, medical, optical, and dental benefits. for officers and employees of the state and their dependents. including those employees of entities controlled by boards or commissions created by this constitution.

(Adopted November 6, 1984)

Section 2. Medical benefits may be authorized for political subdivision officers, employees and their dependents.—Other provisions of this constitution to the contrary notwithstanding, the general assembly may authorize any county, city or other political corporation or subdivision to provide or contract for health insurance benefits, including but not limited to hospital. chiropractic, surgical, medical, optical, and dental benefits, for officers and employees and their dependents.

(Adopted November 6, 1984)

Section 3. Compensation of state elected officials, general assembly members and judges to be set by Missouri Citizen's Commission on Compensation—members qualifications, terms, removal, vacancies, duties—procedure.—1. Other provisions of this constitution to the contrary notwithstanding, in order to ensure that the power to control the rate of compensation of elected officials of this state is retained and exercised by the tax paying citizens of the state, after the effective date of this section no elected state official, member of the general assembly, or judge, except municipal judges, shall receive compensation for the performance of their duties other than in the amount established for each office by the Missouri citizen's commission on compensation for elected officials established pursuant to the provisions of this section. The term "compensation" includes the salary rate established by law, mileage allowances, per diem expense allowances.

Appendix B, 1 of 4

Art. XIII § 3 CONSTITUTION OF MISSOURI 144

2. There is created a commission to be known as the "Missouri Citizen's Commission on Compensation for Elected Officials" The Commission shall be selected in the following manner:

(1) One member of the commission shall be selected at random by the secretary of state from each congressional district from among those registered voters eligible to vote at the time of selection. The secretary of state shall establish policies and procedures for conducting the selection at random. In making the selections, the secretary of state shall establish a selection system to ensure that no more than five of the members shall be from the same political party. The policies shall include, but not be limited to, the method of notifying persons selected and for providing for a new selection if any person declines appointment to the commission;

(2) One member shall be a retired judge appointed by the judges of the supreme court, en banc;

(3) Twelve members shall be appointed by the governor, by and with the advice and consent of the senate. Not more than six of the appointees shall be members of the same political party. Of the persons appointed by the governor, one shall be a person who has had experience in the field of personnel management, one shall be a person who is representative of organized labor, one shall be a person representing small business in this state, one shall be the chief executive officer of a business doing an average gross annual business in excess of one million dollars, one shall be a person representing the health care industry, one shall be a person representing agriculture, two shall be persons over the age of sixty years, four shall be citizens of a county of the third classification, two of such citizens selected from a county of the third classification shall be selected from north of the Missouri River and two shall be selected from south of the Missouri River. No two persons selected to represent a county of the third classification shall be from the same county nor shall such persons be appointed from any county represented by an appointment to the commission by the secretary of state pursuant to subdivision (1) of this subsection.

3. All members of the commission shall be residents and registered voters of the state of Missouri. Except as otherwise specifically provided in this section, no state official, no member of the general assembly, no active judge of any court, no employee of the state or any of its institutions, boards, commissions, agencies or other entities, no elected or appointed official or employee of any political subdivision of the state, and no lobbyist as defined by law shall serve as a member of the commission. No immediate family member of any person ineligible for service on the commission under the provisions of this subsection may serve on the commission. The phrase "immediate family" means the parents, spouse, siblings, children, or dependent relative of the person whether or not living in the same household.

4. Members of the commission shall hold office for a term of four years. No person may be appointed to the commission more than once. No member of the commission may be removed from office during the term for which appointed except for incapacity, incompetence, neglect of duty, malfeasance in office, or for a disqualifying change of residence. Any action for removal

shall be brought by the attorney general at the request of the governor and shall be heard in the circuit court for the county in which the accused commission member resides.

5. The first appointments to the commission shall be made not later than February 1, 1996, and not later than February first every four years thereafter All appointments shall be filed with the secretary of state, who shall call the first meeting of the commission not later than March 1, 1996, and shall preside at the first meeting until the commission is organized. The members of the commission shall organize and elect a chairperson and such other officers as the commission finds necessary

6. Upon a vacancy on the commission, a successor shall be selected and appointed to fill the unexpired term in the same manner as the original appointment was made. The appointment to fill a vacancy shall be made within thirty days of the date the position becomes vacant.

7. Members of the commission shall receive no compensation for their services but shall be reimbursed for their actual and necessary expenses incurred in the performance of their duties from appropriations made for that purpose

8. The commission shall, beginning in 1996, and every two years thereafter, review and study the relationship of compensation to the duties of all elected state officials, all members of the general assembly, and all judges, except municipal judges, and shall fix the compensation for each respective position. The commission shall file its initial schedule of compensation with the secretary of state and the revisor of statutes no later than the first day of December, 1996, and by the first day of December each two years thereafter The schedule of compensation shall become effective unless disapproved by concurrent resolution adopted by the general assembly before February 1 of the year following the filing of the schedule. Each schedule shall be published by the secretary of state as a part of the session laws of the general assembly and may also be published as a separate publication at the discretion of the secretary of state. The schedule shall also be published by the revisor of statutes as a part of the revised statutes of Missouri. The schedule shall, subject to appropriations, apply and represent the compensation for each affected person beginning on the first day of July following the filing of the schedule. In addition to any compensation established by the schedule, the general assembly may provide by appropriation for periodic uniform general cost-of-living increases or decreases for all employees of the state of Missouri and such cost-of-living increases or decreases may also be extended to those persons affected by the compensation schedule fixed by the commission. No cost-of-living increase or decrease granted to any person affected by the schedule shall exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

9. Prior to the filing of any compensation schedule, the commission shall hold no less than four public hearings on such schedule, at different geographical locations within the state, within the four months immediately preceding the filing of the schedule. All meetings, actions, hearings, and business of the commission shall be open to the public, and all records of the commission shall be available for public inspection.

Art. XIII § 3 CONSTITUTION OF MISSOURI 146

10. Until the first day of July next after the filing of the first schedule by the commission, compensation of the persons affected by this section shall be that in effect on the effective date of this amendment.

11. Schedules filed by the commission shall be subject to referendum upon petition of the voters of this state in the same manner and under the same conditions as a bill enacted by the general assembly.

(Adopted November 8, 1994)

Appendix B, 4 of 4

1492 LAWS OF MISSOURI, 1997

## Compensation Schedule

### Judges

| | FY98 | | FY99[1] |
|------------------------------|-----------|--------------|---------|
| | Base | Differential | |
| Chief Justice, Supreme Court | $120,000 | $2,500 | |
| Supreme Court | $120,000 | | |
| Court of Appeals Judge | $112,000 | | |
| Circuit Judges | $105,000 | | |
| Associate Circuit Judges | $ 99,000 | | |

### General Assembly

| | FY98 | | FY99[2] | |
|--------------------------------------|---------|--------------|---------|--------------|
| | Salary | Differential | Salary | Differential |
| Senator | $32,500 | | $35,000 | |
| Representative | $32,500 | | $35,000 | |
| Speaker of the House | $32,500 | $3,500 | $35,000 | $3,500 |
| President Pro Tem of the Senate | $32,500 | $3,500 | $35,000 | $3,500 |
| Speaker Pro Tem of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the Senate | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor Leader of the House | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor Leader of the Senate | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, House Budget Committee | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, Senate Appropriation Committee| $32,500 | $2,500 | $35,000 | $2,500 |

Per diem is to be indexed on the Federal standard (Department of Treasury - Internal Revenue Service).[3]

Mileage is to be indexed to the prevailing State of Missouri - Office of Administration rate as applied for all other state employees.[4]

---

[1] FY99 (July 1, 1998) should be based on FY98 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

[2] FY99 (July 1, 1998) should be based on FY99 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

[3] The city of comparison for per diem is Jefferson City, Missouri.

[4] Standard rates are published in employee handbooks annually.

Appendix C, 1 of 2

COMPENSATION SCHEDULE 1493

### Elected Officials

| | FY98 Base | FY99[5] |
|--------------------|--------------|---------|
| Governor | $104,245.92 | |
| Lieutenant Governor| $ 66,780.00 | |
| Secretary of State | $ 83,621.04 | |
| Attorney General | $ 90,496.32 | |
| State Treasurer | $ 83,621.04 | |
| State Auditor | $ 83,621.04 | |

[5] FY99 (July 1, 1998) should be based on FY98 base + any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

EDITOR'S NOTE: This schedule was filed with the Secretary of State's office on November 30, 1996, pursuant to the requirements of the Missouri Constitution, Article XIII, Section 3.

The schedule was disapproved by the Missouri General Assembly by adoption of S.C.R. No. 3 on January 29, 1997.

Appendix C, 2 of 2

# SCHEDULE OF COMPENSATION

The following contains the initial schedule of compensation filed with the Revisor of Statutes by the Missouri Citizen's Commission on Compensation for Elected Officials as required by the Missouri State Constitution, Article XIII.

To:

The Honorable Secretary of State
Rebecca McDowell Cook
600 West Main and 208 State Capitol
P.O. Box 778
Jefferson City, Missouri 65102

To:

Revisor of Statutes
Ralph C. Kidd
Director on Legislative Research
117-A State Capitol
Jefferson City, Missouri 65101

From:

Robert O. Kortkamp
Chairman
Missouri Citizen's Commission on
Compensation for Elected Officials

c/o John D. Boehm
Deputy Commissioner —Office of Administration
Rm 760 - Truman Building
P.O. Box 809
Jefferson City, Missouri 65102

On behalf of the 1996-98 session of the Missouri Citizen's Commission on Compensation for Elected Officials, enclosed herewith is the Commission's report. Appendix A-Compensation Schedule contains the initial schedule of compensation as required by the Missouri State Constitution, Article XIII.

Sincerely,

Robert O. Kortkamp
Chairman
November 30, 1996

---

3154 APPENDIX F

## APPENDIX A
## COMPENSATION SCHEDULE

### JUDGES

| | FY 98 Base | Differential | FY 99 |
|---|---|---|---|
| Chief Justice, Supreme Court | $120,000 | $2,500 | |
| Supreme Court | $120,000 | | |
| Court of Appeals Judge | $112,000 | | |
| Circuit Judges | $105,000 | | |
| Associate Circuit Judges | $ 99,000 | | |

### GENERAL ASSEMBLY

| | FY 98 Salary | Differential | FY 99' Salary | Differential |
|---|---|---|---|---|
| Senator | $32,500 | | $35,000 | |
| Representative | | $32,500 | | $35,000 |
| Speaker of the House | | $32,500 | $3,500 | $35,000 | $3,500 |
| President Pro Tem of the Senate | | $32,500 | $3,500 | $35,000 | $3,500 |
| Speaker Pro Tem of the House | | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the House | | $32,500 | $2,500 | $35,000 | $2,500 |
| Majority Floor Leader of the Senate | | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor Leader of the House | | $32,500 | $2,500 | $35,000 | $2,500 |
| Minority Floor Leader of the Senate | | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, House Budget Committee | | $32,500 | $2,500 | $35,000 | $2,500 |
| Chair, Senate Appropriation Committee | $32,500 | $2,500 | $35,000 | $2,500 |

Per diem is to be indexed on the Federal standard (Department of Treasury - Internal Revenue Service)'.
Mileage is to be indexed to the prevailing State of Missouri - Office of Administration rate as applied for all other state employees.'

---

'FY99 (July 1, 1998) should be based on FY98 base - any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

'FY99 (July 1, 1998) should be based on FY99 base - any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor + differential, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

'The city of comparison for per diem is Jefferson City, Missouri.

'Standard rates are published in employee handbooks annually.

### ELECTED OFFICIALS

| | FY 98 Base | FY 99' |
|---|---|---|
| Governor | $104,245.92 | |
| Lt. Governor | $ 66,780.00 | |
| Secretary of State | $ 83,621.04 | |
| Attorney General | $ 90,496.32 | |
| State Treasurer | $ 83,621.04 | |
| State Auditor | $ 83,621.04 | |

'FY99 (July 1, 1998) should be based on FY98 base - any periodic uniform general cost-of-living increases or decreases appropriated by the general assembly and signed by the Governor, not to exceed the uniform general increase or decrease provided for all other state employees by the general assembly.

**Appendix D, 2 of 2**

STEPHEN N. LIMBAUGH, Jr., Judge, concurring.

I reach the same result as the majority, but I do so with a different rationale. In my view, the legislature succeeded in dis-approving the Citizens' Commission schedule of compensation so that it never took effect and never became "subject to appropriations."

## I.

The case necessarily turns on the meaning of the term "concurrent resolution" as used in article XIII, section 3.8, of the Missouri Constitution, which states, "The schedule of compensation shall be effective unless disapproved by concurrent resolution adopted by the General Assembly before February 1 . . . ." Citing the requirement of article III, section 21 that "No law shall be passed except by bill . . .," the majority takes the not unreasonable position that the term "concurrent resolution" means a concurrent resolution that is enacted in the same manner as a full-fledged bill. Under this analysis, the resolution disapproving the schedule of compensation was invalid because it was not "third read" in the House chamber, which is one of the constitutional requirements for enactment of a bill, Mo. Const., art. III, sec. 21. In essence, the majority equates the adoption of a concurrent resolution under article XIII, section 3.8, with the enactment of a bill.

My disagreement with the majority stems from the fact that the constitutional definition of a concurrent resolution under article IV, section 8, which is the only provision of the Constitution that pertains to concurrent resolutions, refers to a patently different form of legislative action than the enactment of a bill. Article IV, section 8, states:

Every resolution to which the concurrence of the senate and house of representatives may be necessary, . . . shall be presented to the governor, and before the same shall take effect, shall be proceeded upon in the same manner as in the case of a bill; provided, that no resolution shall have the effect to repeal, extend, or amend any law.

In *Bohrer v. Toberman,* 360 Mo. 244, 227 S.W.2d 719, 723 (banc 1950)—the only case to definitively interpret the peculiar requirements of article IV, section 8—this Court held:

[This section] does not mean that such a resolution shall be proceeded upon in the first instance "in the same manner

as in the case of a bill." On the contrary, it means that *after* such a resolution shall have been presented to the governor, and before it shall take effect, it shall then be proceeded upon in the same manner as in the case of a bill. As the Court then explains, article IV, section 8, refers solely to post-presentment procedures, which include the possibility of a gubernatorial veto, Mo. Const. art. III, sec. 31, and the possibility of a veto override by two-thirds vote of both houses of the General Assembly. Mo. Const. art. III, sec. 32. *Bohrer,* 227 S.W.2d at 723. Significantly, article IV, section 8, makes no mention of the pre-presentment procedures, which include, *inter alia,* the referral of bills to committees, art. III, sec. 22; limitations on the scope of bills and the contents of their titles, art. III, sec. 23; and, of critical importance to this case, the requirement that every bill shall be read by title on three different days in each house, art. III, sec. 21.

The distinction between adoption of a concurrent resolution and enactment of a bill is borne out further by the inclusion of the proviso to article IV, section 8—"that no resolution shall have the effect to repeal, extend, or amend any law." The obvious purpose of the proviso is to limit the effect of such resolutions because they are not passed in the same manner and with the same precautionary measures as are bills. Had article IV, section 8, specified the same requirements for concurrent resolutions as for bills, then there would be no need to limit the effect of concurrent resolutions under the proviso.

The proviso precludes an article IV, section 8, resolution from having "the effect to repeal, extend, or amend any law," which is clearly a reference to the repeal, extension or amendment of existing laws, but a resolution that does not address existing law does indeed have the force and effect of law. *See State ex rel. Royal Insurance v. Director of the Missouri Department of Insurance,* 894 S.W.2d 159, 162 (Mo. banc 1995); *State v. Atterbury,* 300 S.W.2d 806,

817 (Mo. banc 1957) ("It is our conclusion and holding that ... concurrent resolutions mentioned in article IV, section 8, are those resolutions which have the force and effect of law."). Moreover, an article IV, section 8, resolution acquires the force and effect of law solely by virtue of being signed by the governor or passed over the governor's veto. *State ex rel. Royal Insurance,* 894 S.W.2d at 162 ("In order to have 'the force and effect of law' ... a concurrent resolution must either be approved by the governor or passed over the governor's objections."). In *Atterbury,* for instance, the resolution in question did *not* have the force and effect of law precisely because it was *not* submitted to the governor. *Atterbury,* 300 S.W.2d at 817. Contrary to the majority's contention, no case has held that an article IV, section 8, resolution must be processed in the same manner as a bill—with pre-presentment requirements—in order to have the force and effect of law.

In this case, the concurrent resolution in question had the force and effect of law because 1) it was presented to and signed by the governor, and 2) it did not purport to address any existing law, but simply disapproved a law that had not yet taken effect. The article III, section 21, third reading requirement as well as all other pre-presentment requirements, were irrelevant and unnecessary. Thus, the resolution operated to disapprove the schedule of compensation.

One other point bears mention. If the majority is correct that the requirements for a concurrent resolution are the same as those for a bill, then why does article XIII specify the mechanism of a concurrent resolution rather than a bill to disapprove the schedule of compensation? Surely the specification of one mechanism over the other was no mere coincidence, but instead reflected the apparent understanding of those who framed article XIII, and those who voted to adopt it, that a concurrent resolution is, in fact, different than a bill. The point is demonstrated further by the inclusion of the February 1 cutoff for disapproving the schedule. That cutoff, less than a month from the time the legislature convenes in early January, leaves hardly enough time to accommodate the pre-presentment procedures that would be required for enactment of a bill. On the other hand, the February 1 cutoff leaves ample time for the adoption of a concurrent resolution unadorned by those pre-presentment requirements, or so the framers and the voters must have thought.

## II.

Notwithstanding that my approach would moot the important question of the meaning of the clause "subject to appropriation," I concur in the majority's determination that the clause allows the General Assembly to refuse to appropriate the schedule of compensation, and the further determination that such refusal must address the entire schedule or not at all. I also concur in that part of the majority opinion rejecting the contention that S.B. 299 was an unconstitutional per diem allowance. The majority is correct that S.B. 299 provides reimbursement for actual and necessary expenses rather than a per diem, although the members of the General Assembly may well find this holding a mixed blessing, given the accounting that will undoubtedly be required to determine just what expenses were, in fact, actual and necessary.